**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
15th Floor
Los Angeles, CA 90024
Telephone:  (310) 405-7190
E-mail:  jpafiti@pomlaw.com

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| STEVEN FRIEDLAND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INOGEN, INC., SCOTT WILKINSON and ALISON BAUERLEIN,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Steven Friedland ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Inogen, Inc. ("Inogen" or the "Company"), securities analyst reports and advisories, press releases, media reports, conference call transcripts, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a securities class action brought on behalf of all purchasers of Inogen securities between November 8, 2017 and February 26, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Exchange Act. Defendants include Inogen and certain of its senior executives.

2. Inogen is a medical device company specializing in the design and manufacture of portable oxygen concentrators, which are used to provide oxygen therapy to patients suffering from a range of respiratory conditions such as chronic obstructive pulmonary disease ("COPD"), chronic bronchitis, or emphysema.

3. Home oxygen production has traditionally been done through a two-stage process. The process uses large stationary machines (the size of a basement dehumidifier or a college mini-fridge) to draw oxygen from the air and concentrate it and a separate portable oxygen tank to store the concentrated oxygen. The patient can then roll the separate oxygen tank along with them as they move around, providing the oxygen needed to breathe. Inogen manufactures and sells or rents smaller portable devices that concentrate oxygen and provide it directly to the patient, removing the need for two separate devices.

4. Inogen's reported revenues have grown dramatically over the past several years, increasing by more than 41% from $112.5 million during fiscal 2014 to $159 million

1

during fiscal 2015, by another more than 27% to $202.8 million during fiscal 2016, and by another more than 45% to nearly $295 million during fiscal 2017. Indeed, based on its 2016 sales, Inogen claimed throughout the Class Period that it was "the leading worldwide manufacturer of portable oxygen concentrators."

5.     The Company reports its financial results in three business segments:  (i) direct-to-consumer; (ii) domestic business-to-business; and (iii) international.

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Inogen's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Inogen was overstating the true size of the total addressable market ("TAM") for its portable oxygen concentrators, claiming it was upwards of 3 million people; (ii) Inogen was misstating the basis for its calculation of the TAM; (iii) Inogen was falsely attributing its sales growth to the strong sales acumen of its salesforce, when in reality it was due in large part to sales tactics designed to deceive its elderly customer base (including inducing them to purchase portable oxygen concentrators from Inogen at inflated prices by claiming that Medicare did not otherwise cover payment for such devices if obtained from other providers); (iv) as such, the growth in Inogen's domestic business-to-business sales to home medical equipment ("HME") providers was inflated, unsustainable and was eroding direct-to-consumer sales; (v) very little of Inogen's business was actually coming from the more stable Medicare market; and (vi) as a result, Inogen's public statements were materially false and misleading at all relevant times.

7.     On November 6, 2018, Inogen released its third quarter 2018 financial results after the market closed.  While the quarterly financial results were in line with expectations, defendants revealed that the growth in domestic business-to-business sales to HME providers had slowed precipitously to 32% from 56% in the second quarter of 2018.  Inogen also reduced its guidance for fiscal 2018 adjusted EBITDA to $60 to $62 million from $65 to $69 million.

2

8.      Following these disclosures, the price of Inogen common stock fell $37.44 per share, or over 19%, to close at $155.86 per share on heavy volume of 2.64 million shares traded, almost five times the average daily volume over the preceding five trading days.

9.      Then, on February 26, 2019, after the close of trading, Inogen issued a press release announcing its fourth quarter and fiscal year 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018, and conducted a conference call with investors and stock analysts to discuss its business metrics and financial prospects.  During the conference call, defendant Scott Wilkinson backtracked on the Company's prior TAM estimate of 2.5 to 3 million patients, and blamed Inogen's poor "domestic business-to-business sales" on "order activity [that] slow[ed] from one national home care provider in the fourth quarter of 2018."  Inogen also reported that its 4Q18 non-GAAP EBITDA was $10.5 million, 9.5% lower than fiscal 2017, and significantly reduced its previously provided fiscal 2019 net income guidance, blaming in large part the decline in its own stock price.

10.      On this news, the price of Inogen common stock fell an additional $33.77 per share, or more than 24%, from a close of $140.06 per share on February 26, 2019, to a close of $106.28 per share on February 27, 2019, on unusually high volume of more than 3.64 million shares traded, or more than seven times the average daily trading volume over the preceding five trading days.

11.      By overstating the strength of Inogen's salesforce acumen and the size of the TAM for its portable oxygen concentrators throughout the Class Period, Inogen and its senior executives led the market to believe the Company's business metrics and financial prospects were much stronger than they really were, causing a sizable run-up in the price of Inogen common stock, which skyrocketed from its close of $101.65 per share on November 7, 2017 to reach a Class Period high of more than $282 per share by September 14, 2018.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12.    Notably, both Defendant Scott Wilkinson ("Wilkinson"), the Company's President and Chief Executive Officer ("CEO"), and Defendant Alison Bauerlein ("Bauerlein"), the Company's Executive Vice President and the Chief Financial Officer ("CFO") sold massive amounts  of Company common stock during the Class Period at times when Inogen's stock was artificially inflated as a result of their false and misleading statements. Specifically, Defendant Wilkinson sold 167,533 shares of Inogen common stock during the Class Period, grossing over $10.6 million for himself, and Defendant Bauerlein sold 365,139 shares of Inogen common stock, grossing over $13 million.

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5].

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act.  This is a civil action arising under the laws of the United States of America.

16.    Venue is proper in this District pursuant to § 27 of the Exchange Act because certain of the acts and practices complained of herein occurred in this District.  Inogen is headquartered in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

17.    In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

18.    Plaintiff, as set forth in the accompanying certification, incorporated herein by reference, purchased Inogen securities at artificially inflated prices and has been damaged thereby.

19.    Defendant Inogen is a Delaware registered corporation with principal executive offices located at 326 Bollay Drive, Goleta, California.  Throughout the Class Period, Inogen common stock traded on the NASDAQ, an efficient market, under the ticker symbol "INGN."  As of February 22, 2019, Inogen had more than 21.8 million shares of common stock issued and outstanding.

20.    Defendant Scott Wilkinson ("Wilkinson") has served as President and Chief Executive Officer ("CEO") of Inogen at all relevant times and as a member of its Board of Directors.

21.    Defendant Alison Bauerlein ("Bauerlein") has served as Executive Vice President and the Chief Financial Officer ("CFO") of Inogen at all relevant times.

22.    Defendants Wilkinson and Bauerlein are collectively referred to herein as the "Individual Defendants."

23.    Because of the Individual Defendants' executive positions, they each had access to undisclosed adverse information about Inogen's business, operations, operational trends, controls, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board of Directors meetings and committees thereof.

24.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

confidential proprietary information concerning the Company and its business, operations, operational trends, controls, markets, and present and future business prospects, as alleged herein.   In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25.   As officers and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act and trades on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, operational trends, controls, markets, and present and future business prospects.   In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded stock would be based upon truthful and accurate information.   Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of the various SEC filings, press releases and other public statements pertaining to the Company and issued during the Class Period.   Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.   Defendants are liable for making materially false

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements and failing to disclose adverse facts known to them about Inogen. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Inogen stock was a success, as it: (i) deceived the investing public regarding Inogen's business metrics and financial prospects; (ii) artificially inflated the price of Inogen common stock; and (iii) caused plaintiff and other members of the Class (as defined below) to purchase Inogen stock at fraud-inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

27.    Inogen is a medical device company specializing in the design and manufacture of portable oxygen concentrators, which are used to provide oxygen therapy to patients suffering from a range of respiratory conditions such as COPD, chronic bronchitis, or emphysema.

28.    Home oxygen production has traditionally been done through a two-stage process. The process uses large stationary machines (the size of a basement dehumidifier or a college mini-fridge) to draw oxygen from the air and concentrate it and a separate portable oxygen tank to store the concentrated oxygen. The patient can then roll the separate oxygen tank along with them as they move around, providing the oxygen needed to breathe. Inogen manufactures and sells or rents smaller portable devices that concentrate oxygen and provide it directly to the patient, removing the need for two separate devices.

29.    Inogen's reported revenues have grown dramatically over the past several years, increasing by more than 41% from $112.5 million during fiscal 2014 to $159 million during fiscal 2015, by another more than 27% to $202.8 million during fiscal 2016, and by another more than 45% to nearly $295 million during fiscal 2017. Indeed, based on its 2016 sales, Inogen claimed throughout the Class Period that it was "the leading worldwide manufacturer of portable oxygen concentrators."

7

30.     The Company reports its financial results in three business segments:  (i) direct-to-consumer; (ii) domestic business-to-business; and (iii) international.

**Materially False and Misleading Statements Issued During the Class Period[1]**

31.     The Class Period begins on November 8, 2017.  On November 7, 2017, after the close of trading, Inogen announced its third quarter 2017 ("3Q17") financial results for the period ended September 30, 2017, and provided financial guidance for the remainder of fiscal year 2017 ("FY17") and for FY18.  In addition to announcing "[r]ecord total revenue of $69.0 million, up 26.8% over the same period in 2016," Inogen also increased its fourth quarter 2017 ("4Q17") revenue guidance to a "range [of] . . . $244 to $248 million, which represents year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million," stating that "direct-to-consumer sales and domestic business-to-business sales [would] be [its] strongest growing channels and [would] have similar growth rates," and that "Inogen expect[ed] rental revenue to decline in 2017 compared to 2016 by approximately 32% based on lower average rental revenue per patient and a focus on sales versus rentals."  The Company "maintain[ed] its guidance range for full year 2017 net income of $25 to $27 million, which represents 21.8% to 31.6% year-over-year growth," and "increas[ed] its guidance range for full year 2017 Adjusted EBITDA to $49 to $51 million, which represents year-over-year growth of 12.9% to 17.5%, and compares to previous guidance of $48 to $50 million."  Inogen "provid[ed] a guidance range for full year 2018 total revenue of $295 to $305 million, representing 19.9% to 24.0% growth over the 2017 guidance mid-point of $246 million," and stated that the "Company expect[ed] direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate," and "rental revenue to be relatively flat in 2018 compared to 2017 with reimbursement rates stable and a continued focus on sales versus rentals."  Inogen also "provid[ed] a full year 2018 net income estimate of $31 to $35 million, representing 19.2%

---

[1] Emphasis added throughout, unless otherwise noted.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to 34.6% growth over the 2017 guidance mid-point of $26 million," and "Adjusted EBITDA of $60 to $64 million, representing 20.0% to 28.0% growth over the 2017 guidance mid-point of $50 million."

32.    Justifying the increase in Inogen's FY17 guidance and its FY18 financial guidance, the release quoted defendant Wilkinson as crediting the strong and growing market for portable oxygen and the Company's strong direct-to-customer salesforce acumen, stating in pertinent part as follows:

> The third quarter of 2017 was a record revenue quarter for us, ***driven by increased sales in our domestic business-to-business and direct-to-consumer channels*** . . . . We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our channels. ***We believe we should see strong results in 2018 as portable oxygen concentrators continue to be adopted worldwide***.

33.    Inogen's 3Q17 earning release also touted the Company's strong sales growth, stating in pertinent part as follows:

> Inogen is increasing its guidance range for full year 2017 revenue to $244 to $248 million, which represents year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million. ***The Company expects direct-to-consumer sales and domestic business-to-business sales to be our strongest growing channels and to have similar growth rates*** . . . .

34.    Defendant Wilkinson opened the Company's November 7, 2017, conference call with Inogen investors and stock analysts by attributing the ongoing revenue growth to its salesforce's strong sales acumen, stating in pertinent part as follows:

> We continued to steadily invest in direct-to-consumer sales force additions in the United States. We also worked to optimize our new customer relationship management, or CRM system, and I'm pleased that ***we have delivered such strong sales and solid bottom line results*** during the third quarter while we were still investing in training and productivity improvements in the system.

35.    Also on November 7, 2017, Inogen filed its quarterly financial report with the SEC on Form 10-Q, which was signed and certified by the Individual Defendants

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

pursuant to the Sarbanes Oxley Act of 2002. As to the strength of the Company's sales growth and the size of its TAM, the 3Q17 10-Q stated in pertinent part as follows:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. **_The Company estimates based on 2016 Medicare data that patients using portable oxygen concentrators represent approximately 9.1% of the total addressable oxygen market in the United States_**, although the Medicare data does not account for private insurance and cash-pay sales into the market . . . .

> Since adopting the Company's direct-to-consumer strategy in 2009 following its acquisition of Comfort Life Medical Supply, LLC, which had an active Medicare billing number but few other assets and limited business activities, the Company has directly sold or rented more than 327,000 of its Inogen oxygen concentrators as of September 30, 2017.

36.    The market responded positively to defendants' November 7, 2017 false and misleading statements, with the price of Inogen common stock rising from a close of $101.65 per share on November 7, 2017 to a close of $117.38 per share on November 8, 2017, on unusually high volume of more than 2.4 million shares traded, approximately four times the average daily volume over the preceding five trading days.

37.    On February 27, 2018, Inogen issued a press release announcing its FY17 financial results. In addition to emphasizing that "[t]otal revenue of $63.8 million" for FY17 was "up 25.4% over the same period in 2016," Inogen again increased its FY18 financial guidance, providing a "revenue guidance range [of] $298 to $308 million, up from $295 to $305 million, representing growth of 19.5% to 23.5% versus 2017 full year results," stating that it "expect[ed] direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and" for "rental revenue to be relatively flat in 2018 compared to 2017 as the Company continues to focus on sales versus rentals." Inogen also "increas[ed] its full year 2018 GAAP net income and non-GAAP net income guidance range to $36 to $39 million, up from $31 to $35 million, representing growth of 71.4% to 85.7% compared to 2017 GAAP net income of $21.0

million and growth of 26.0% to 36.5% compared to 2017 non-GAAP net income of $28.6 million," while "maintaining its guidance range for full year 2018 Adjusted EBITDA of $60 to $64 million, representing 18.0% to 25.9% growth compared to 2017 results."

38.    Justifying the increase in Inogen's FY18 financial guidance, defendant Wilkinson touted the Company's "successful [fourth] quarter" as being "driven by record sales in our domestic direct-to-consumer channel and strong sales in our domestic business-to-business channel."

39.    That same day, Inogen filed its FY17 annual report on Form 10-K with the SEC (the "FY17 10-K"). The FY17 10-K discussed what it characterized as a strong and growing market for Inogen's portable oxygen concentrators, which it essentially claimed lacked any competitive pricing pressure or any threats thereof, stating in pertinent part as follows:

> **Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016**. We estimate based on 2016 Medicare data that the total number of patients using portable oxygen concentrators **represents approximately 9.1% of the total addressable oxygen market** in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.
>
> * * *
>
> **Our market**
>
> **We believe the current total addressable oxygen therapy market in the United States is approximately $3 billion to $4 billion**, based on 2016 Medicare data and our estimate of the ratio of the Medicare market to the total market. As of 2016, we estimate that there are 4.5 million patients worldwide who use oxygen therapy, **including 2.5 to 3 million patients in the United States, and more than 60% of oxygen therapy patients in the United States are covered by Medicare. The number of oxygen therapy patients in the United States is projected to grow by approximately 7% to 10% per year between 2017 and 2021**, which we believe is the result of earlier diagnosis of chronic respiratory conditions, demographic trends and longer durations of long-term oxygen therapy.
>
> * * *

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

According to our analysis of 2016 Medicare data, approximately 70% of U.S. oxygen users require ambulatory oxygen and the remaining 30% are considered stationary, and either require oxygen twenty-four hours a day, seven days a week, or 24/7, but are not ambulatory, or do not require oxygen 24/7 and only need nocturnal oxygen . . . .

. . . Despite the ability of portable oxygen concentrators to address many of the shortcomings of traditional oxygen therapy, we estimate based on 2016 Medicare data that the total number of patients on portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

40.    On April 30, 2018, Inogen issued a press release announcing its first quarter 2018 ("1Q18") financial results for the period ended March 31, 2018, again increasing its FY18 financial guidance.  In addition to reporting that its "record" 1Q18 revenues had grown "50.6% over the same period in 2017" to $79.1 million, and that net income had grown 81.4% during the same time period to $10.8 million, Inogen significantly "increas[ed] its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results."  The Company stated that it "continue[d] to expect direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and "rental revenue to be down approximately 10% in 2018 compared to 2017 as the Company continues to focus on sales versus rentals."  Inogen also "increas[ed] its full year 2018 GAAP net income and non-GAAP net income guidance range to $38 to $41 million, up from $36 to $39 million, representing growth of 80.9% to 95.2% compared to 2017 GAAP net income of $21.0 million and growth of 33.0% to 43.5% compared to 2017 non-GAAP net income of $28.6 million," and its "guidance range for full year 2018 Adjusted EBITDA to $62 to $67 million, up from $60 to $64 million, representing 22.0% to 31.8% growth compared to 2017 results."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

41.    Justifying the increase in Inogen's FY18 financial guidance, the release quoted defendant Wilkinson as crediting the strong and growing market for portable oxygen concentrators and the strong sales acumen of its direct-to-customer and domestic business-to-business salesforce, stating in pertinent part as follows:

> In what is historically a seasonally slower quarter, we were able to generate ***record revenues driven by strong sales in both our domestic direct-to-consumer and domestic business-to-business channels*** . . . . We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels. We are currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020. We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

42.    The Company's 1Q18 earnings release further touted Inogen's strong sales results and outlook, stating in pertinent part as follows:

> Total revenue for the three months ended March 31, 2018 rose 50.6% to $79.1 million from $52.5 million in the same period in 2017. ***Direct-to-consumer sales rose 67.8% over the same period in 2017, ahead of expectations*** primarily due to increased sales representative headcount and associated consumer marketing. ***Domestic business-to-business sales exceeded expectations and grew 60.4% over the same period in 2017***, primarily driven by continued strong demand from the Company's private label partner and traditional home medical equipment providers.
>
> * * *
>
> Inogen is increasing its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results. The Company ***continues to expect direct-to-consumer sales to be its fastest growing channel, [and] domestic business-to-business sales to have a solid growth rate*** . . . .

43.    During the Company's 1Q18 conference call held later that same day with Inogen investors and stock analysts, defendant Wilkinson again emphasized the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company's strong direct-to-consumer and business-to-business sales growth, stating in pertinent part as follows:

> Our record direct-to-consumer sales of $28.7 million in the first quarter of 2018 exceeded our expectations, primarily due to increased sales representative headcount and associated consumer spending. We're currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020, with the majority of those being sales reps. Given our recent success, our strategy is to steadily to hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe that it's still our most effective means to drive growth of the direct-to-consumer sales.

> In fact, we expect to release a new TV commercial to showcase the benefits of our portable oxygen concentrators in the second quarter. Further, we initiated a direct-to-consumer pricing trial in the second quarter of 2018 to ensure our products are optimally priced. We expect to provide an update on this trial on our next earnings call.

> ***First quarter of 2018 domestic business-to-business sales of $28 million was a record for us and exceeded our expectations, primarily due to continued success with our private label partner and traditional home medical equipment providers***.

> \* \* \*

> Looking ahead, I'm very proud of our Inogen associates and the progress made in what has historically been a seasonally slower quarter.

> While we've been engaged in multiple initiatives to fuel future growth, ***we've accelerated current growth, especially in the domestic direct-to-consumer and business-to-business sales channels***. I'm very pleased with the increased adoption in these markets with our best-in-class and patient-preferred products.

44.     Defendant Bauerlein further commented on the Company's sales prospects, stating that "[w]e expect direct-to-consumer sales to be our fastest-growing channel [and] domestic business-to-business sales to have a significant growth rate."

45.     And in response to an analyst's question about the "very quick[]" growth of business-to-business and "the long-term mix of business between B2B and direct-to-

14

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

consumer," defendant Bauerlein responded by addressing the Company's sales growth and referencing the TAM, stating in pertinent part as follows:

> Yes. So when you look at that, while certainly B2B has a lower gross margin profile, it also has much lower operating expenses associated with it. So when we look at the market opportunity, ***we look to capture share both on the B2B side and the direct-to-consumer side because we're relatively agnostic on the bottom line. What we have been doing, though, is continuing to invest in the B2C side because we're still very early in the market penetration curve***. As Scott said earlier, ***9% or so penetration in the last data*** as of the end of 2016, we still have a long – we have a long ramp to go to continue to take share both on the direct-to-consumer side as well as the business-to-business side away from the tank-based business model. So our focus really is to ***make sure that we maintain a market leadership position and that we continue to grow the market both on [the] direct-to-consumer side and the B2B side and not to drive a specific mix in our business***. Now inherent in guidance in 2018 is that direct-to-consumer sales would be the fastest-growing channel. So that would actually be a tailwind to gross margin expansion over the course of the year.

46.    That same day, Inogen filed a quarterly report on Form 10-Q with the SEC, which was signed and certified by the Individual Defendants pursuant to the Sarbanes Oxley Act of 2002 and expressly incorporated by reference the description of the Company's business detailed above in ¶ 39 from the Company's FY17 10-K, and further specifically reiterated in pertinent part as follows:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. ***The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay patients in the market.

47.    On this news, the price of Inogen common stock rose again, climbing more than $32.00 per share from its close of $140.58 per share on April 30, 2018 to close at $173.17 per share on May 1, 2018, on unusually high volume of more than 1.1 million

shares traded, approximately nine times the average trading over the preceding ten trading days.

48.     On August 7, 2018, Inogen issued a press release announcing its second quarter 2018 ("2Q18") financial results for the period ended June 30, 2018, again increasing its FY18 financial guidance.  In addition to reporting "record" 2Q18 revenues had grown "51.6% over the same period in 2017" to $97.2 million, and that net income had grown 75.2% during the same time period to $14.6 million, Inogen again significantly "increas[ed] its full year 2018 total revenue guidance range to $340 to $350 million, up from $310 to $320 million, representing growth of 36.3% to 40.3% versus 2017 full year results," stating that it "continue[d] to expect direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a significant growth rate, and international business-to-business sales to have a solid growth rate," and that "rental revenue [would] be down approximately 10% in 2018 compared to 2017 as the Company continue[d] to focus on sales."  Inogen also "increas[ed] its full year 2018 GAAP net income and non-GAAP net income guidance range to $45 to $48 million, up from $38 to $41 million, representing growth of 114.3% to 128.5% compared to 2017 GAAP net income of $21.0 million and growth of 57.5% to 67.9% compared to 2017 non-GAAP net income of $28.6 million," and "its guidance range for full year 2018 Adjusted EBITDA to $65 to $69 million, up from $62 to $67 million, representing 27.9% to 35.7% growth compared to 2017 results."

49.     To justify the Company's financial guidance, the release again quoted defendant Wilkinson as crediting the strong sales acumen of its salesforce, stating in pertinent part as follows:

> The second quarter of 2018 was a notably strong quarter for us as we generated record revenue across all three sales channels, while also reporting record operating income . . . . We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as we believe this is still our most effective

16

means to drive high revenue growth and portable oxygen concentrator adoption

50.     During the conference call held later that day with Inogen investors and stock analysts, defendant Wilkinson again emphasized that the Company's strong direct-to-consumer sales were the result of the strong sales acumen of its salesforce, stating in pertinent part as follows:

> Looking ahead, I'm very proud of our Inogen associates and the progress made thus far in 2018. While we've been engaged in multiple initiatives to fuel future growth, *we've accelerated our current growth, especially in the domestic direct-to-consumer and business-to-business sales channels*. I'm very pleased with the increased adoption in these markets with our best-in-class and patient preferred products.

51.     Defendant Wilkinson also addressed a question from an analyst "about the sustainability of business-to-business," engaging in the following colloquy:

> [Analyst:] I was hoping you could talk about the *sustainability of business-to-business*. This is one that can be lumpy, but it does look like it's really moving in the direction of full adoption here. So I think *what people would really like to better understand is, what inning are we in, in terms of adoption from the larger players, the middle sized and the smaller players? And how sustainable is it in the near term? And what could be [rallied] here in your opinion*?

> [Wilkinson:] Yes. It's – I just mentioned in the previous question that *I think in the what inning we're in [sic], second inning, maybe third inning, but certainly, we're in the first third of the game, if you will*.

52.     That same day, Inogen filed its 2Q18 quarterly report on Form 10-Q with the SEC, which was signed and certified by the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 and expressly incorporated by reference the description of the Company's business detailed above in ¶ 39 from the FY17 10-K, and specifically reiterated in pertinent part as follows:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. *The Company*

17

***estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States***, although the Medicare data does not account for private insurance and cash-pay patients in the market.

53.    The market again responded positively to defendants' comments, with the price of Inogen common stock climbing from a close of $213.26 per share on August 7, 2018 to a close of $230.08 per share on August 8, 2018, on unusually high volume of 782,800 shares traded, or more than three and a half times the average volume over the preceding ten trading days.  The price of Inogen common stock continued to climb thereafter, reaching a Class Period high of more than $282.00 per share on September 14, 2018.

54.    On November 6, 2018, Inogen issued a press release announcing its 3Q18 financial results for the period ended September 30, 2018.  Inogen reported "[t]otal revenue of $95.3 million, up 38.0% over the same period in 2017" and "net income of $16.4 million, reflecting a 123.9% increase over the same period in 2017."  The release quoted defendant Wilkinson as characterizing 3Q18 as "another successful quarter for [Inogen,] as [it] generated ***strong revenue across all three sales channels***," adding that it was "continuing to execute on [its] strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as [it] believe[d] this [was] still [its] most effective means to drive high revenue growth and portable oxygen concentrator adoption."

55.    As to its FY18 financial guidance, Inogen stated that the "Company still expect[ed] direct-to-consumer sales to be its fastest growing channel," adding that "domestic business-to-business sales [would still] have a significant growth rate" and that "international business-to-business sales [would] have a solid growth rate."  Inogen also "narrow[ed]" its FY18 net income guidance, stating it would come in at a range of "$46 to $48 million," rather than the $45 to $48 million range provided in August 2018.

56.     During the conference call held later that morning with Inogen investors and stock analysts, defendant Wilkinson again emphasized that the Company's strong direct-to-consumer sales were the result of the strong sales acumen of its salesforce, stating in pertinent part as follows:

> Looking ahead to 2019, we expect to remain a high growth company and to continue to invest heavily in our sales force, advertising efforts, and operations, in order to drive portable oxygen concentrator adoption worldwide.

> We also expect to open new international markets, such as China, by year-end 2020, and we plan to continue to invest in regulatory approval and business infrastructure in 2019 to support this initiative.

57.     That same day, Inogen filed its 3Q18 quarterly report on Form 10-Q with the SEC, which was signed and certified by the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 and expressly incorporated by reference the description of the Company's business detailed above in ¶ 39 from the 2017 10-K, and specifically reiterated in pertinent part as follows:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2017. *The Company estimates based on 2017 Medicare data that the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States* although the Medicare data does not account for private insurance and cash-pay patients in the market.

58.     The statements referenced in ¶¶ 31-57 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Inogen was overstating the true size of the TAM by as much as 100%; (ii) Inogen was misstating the basis for its calculation of the TAM; (iii) Inogen was falsely attributing its sales growth to the strong sales acumen of its salesforce, when in reality it was due in

19

large part to sales tactics designed to deceive its elderly customer base (including inducing them to purchase portable oxygen concentrators from Inogen at inflated prices by claiming that Medicare did not otherwise cover payment for such devices if obtained from other providers); (iv) the growth rate in Inogen's business-to-business channel was inflated and sales to HME providers would impose significant barriers to further direct-to-consumer growth, because each unit sold to HMEs through the business-to-business channel would service multiple would-be direct-to-consumer customers over the lifespan of the unit; (v) little of Inogen's business was coming from the more stable Medicare market to which it was attributing its strong sales growth; and (vi) as a result, Inogen's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

59.    Despite reporting otherwise strong earnings and sales guidance in order to keep the price of Inogen common stock from plummeting, because the Company cut its FY18 EBITDA guidance to $60 to $62 million from $65 to $69 million, revealing that growth in Inogen's domestic business-to-business sales was slowing and would see a significant deceleration to 32% from 56% in 2Q18, the price of Inogen common stock declined $37.44 per share, or more than 19%, on November 7, 2018, on unusually high volume of more than 2.64 million shares traded, or approximately six times the average volume over the preceding ten trading days.

60.    On February 8, 2019, stock research analyst and short-seller Carson Block of Muddy Waters published a detailed 27-page report challenging the claimed size of Inogen's TAM, lamenting that the Company had intentionally "created an egregiously false narrative" about its size.  Based on his research, Block stated that Inogen's TAM was "actually shrinking," and that the Company's sales would "peak no later than next year."  According to Block, Inogen "embodies much of what is dysfunctional about today's capital markets:  Misleading statements by management, shoddy market research

presented as authoritative, thorough sell-side capture, and of course significant enrichment of insiders through stock sales."

61.    In his report, Block stated that Inogen's Class Period claims regarding its TAM being 3 million and that it was growing at 7% to 10% annually were based on estimates from research firm WinterGreen Research and that the estimates "appear to have little grounding in reality."  Block was particularly critical of WinterGreen Research's 2017 report, which Inogen based its TAM claims on, stating that WinterGreen plagiarized the *New York Times*.  According to Block, in reality, Inogen's TAM was only 1.3 million users, and at its forecast of peak earnings, he only valued Inogen shares "at $46 per share, a 67% decrease from its [then] current price."

62.    On this news, the price of Inogen common stock declined by more than $3.00 per share, falling from its close of $139.74 per share on February 7, 2019 to close at $136.72 per share on February 8, 2019, on unusually high volume of more than two million shares traded, or more than five-and-half times the average daily volume over preceding ten trading days.

63.    Then on February 12, 2019, Citron Research issued a second report illuminating what it characterized as the Company's "dirty" reseller network and systematic abuse of elders by the Company and resellers through their deceptive sales practices and shoddy sales network, stating that less than 10% of Inogen's sales come from Medicare despite the 75 plus average age of its customers.  The Citron report demonstrated that Inogen had been conspiring with its reseller network to dominate Google listings and using tactics to deceive the elderly into buying its oxygen concentrators by, among other things, falsely telling them that Medicare would not cover the cost of oxygen concentrators sold by other companies (at prices lower than Inogen's) in order to induce them to purchase Inogen's devices at outsized prices the market would not have otherwise provided.  It further disclosed that the top reseller of Inogen products was secretly controlled by a convicted felon who was recently released after five years in federal prison for deceptive internet marketing

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

practices.  The report detailed how increased sales through these nefarious resellers had artificially increased Inogen's direct-to-consumer sales, sales increases that Citron opined were not sustainable on a long-term basis.  Based on its analysis of Inogen's financial reports and the firm's own research, Citron placed a target of just $46 per share on Inogen common stock.

64.    On this news, the price of Inogen common stock, which had since partially recovered, declined again, this time falling by more than $4.00 per share, from a close of $142.20 per share on February 11, 2019 to a close of $138.05 per share on February 12, 2019, on unusually high volume of more than 2.7 million shares traded.

65.    Finally, on February 26, 2019, after the close of trading, Inogen issued a press release announcing its 4Q18 and FY18 financial results and conducted a conference call with Inogen investors and stock analysts.  During the conference call, defendant Wilkinson backtracked on the Company's prior TAM estimate of 2.5 to 3 million patients, stating in pertinent part as follows:

> [W]e've looked at it a few different ways. We keep landing in that same area. I will emphasize that we've always said 2.5 million to 3 million, we haven't said 3.0 million or anything, it's kind of an acknowledgment that it's an estimate, it's probably a tougher estimate now than it used to be because of the movement within the data sources. But I think, the key is it's not 20 million, it's not 500,000. We feel very good about that estimate, no change to that.

66.    Inogen reported in its press release that its 4Q18 non-GAAP EBITDA was $10.5 million, ***down 9.5% year-over-year***.  For fiscal 2019, Inogen warned that it "expect[ed] rental revenue to grow modestly in 2019 compared to 2018, despite the additional 3.9% decline in portable oxygen concentrator Medicare reimbursement rates effective January 1, 2019."  Inogen also reduced its previously provided net income guidance to just $40 to $44 million, down from the $48 to $50 million provided previously, blaming "an estimated decrease in excess tax benefits recognized from stock-based

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

compensation from $12 million to $4 million, due to the Company's current stock price and fewer expected option exercises in 2019."

67.    On this news, the price of Inogen common stock declined further, falling nearly $34.00 per share, or more than 24%, from a close of $140.06 per share on February 26, 2019 to a close of $106.28 per share on February 27, 2019, on unusually high volume of more than 3.64 million shares traded, or more than five times the average daily volume over the preceding ten trading days.

## ADDITIONAL SCIENTER ALLEGATIONS

68.    As alleged herein, Inogen and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Inogen's business metrics and financial prospects, their control over and/or receipt and/or modification of Inogen's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.

69.    Additionally, the Individual Defendants' scienter is revealed by their massive stock sales during the Class Period at times when Inogen's stock was artificially inflated as a result of their false and misleading statements. Specifically, Defendant Wilkinson sold 167,533 shares of Inogen common stock during the Class Period, grossing over $10.6 million for himself, and Defendant Bauerlein sold 365,139 shares of Inogen common stock, grossing over $13 million.  Notably, neither of the Individual Defendants has sold

23

a single share since the truth concerning the Company's business and operations were revealed.

## LOSS CAUSATION/ECONOMIC LOSS

70.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Inogen common stock and operated as a fraud or deceit on Class Period purchasers of Inogen common stock by misrepresenting the Company's business metrics and financial prospects.  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Inogen common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Inogen common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

71.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Inogen common stock during the Class Period, who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

72.    The members of the Class are so numerous that joinder of all members is impracticable.  Inogen stock was actively traded.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from records maintained by Inogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a)      whether the Exchange Act was violated by defendants' acts as alleged herein;

        b)      whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the Company' business metrics and financial prospects; and

        c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

77.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

78.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Inogen stock was an efficient market at all relevant times by virtue of the following factors, among others:

a)    Inogen stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient market;

b)    Inogen regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

c)    Inogen was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the salesforces and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace

79.    As a result of the foregoing, the market for Inogen common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in Inogen stock during the Class Period suffered similar injury through their transactions in Inogen stock at artificially inflated prices and a presumption of reliance applies.

80.    Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Inogen stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.  Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market price for Inogen stock, and are entitled to a

26

presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## COUNT 1

### (Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

81.    Plaintiff repeats and alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

a)    employed devices, schemes and artifices to defraud;

b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Inogen stock during the Class Period.

84.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Inogen stock.  Plaintiff and the Class would not have purchased Inogen stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

27

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT II

### (Violations of §20(a) of the Exchange Act Against All Defendants)

85.    Plaintiff repeats and alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.    The Individual Defendants acted as a controlling persons of Inogen within the meaning of § 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Inogen stock, the Individual Defendants had the power and authority to cause Inogen to engage in the wrongful conduct complained of herein. Inogen controlled the Individual Defendants and all of its employees.  By reason of such conduct, these defendants are liable pursuant to § 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  March 21, 2019                    Respectfully submitted,


**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com


**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
Email: pdahlstrom@pomlaw.com


**HOLZER & HOLZER, LLC**
Corey D. Holzer
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090

29

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

***Attorneys for Plaintiff***

30

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| INGN | 01/15/2019 | 35 | $144.86/$5,070.25 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

DocuSign Envelope ID: A2A9A409-8885-4A82-9012-B34BB1696A98

      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___07___ day of ___March___, 2019 in ____Redding____, ____California____.

                                                           City              State

(Signature) X ___steven Friedland___

DocuSigned by: steven Friedland
BE75156ZA5144D4...

(Print Name) ___Steven Friedland___

                           First             Last

**Inogen, Inc. (INGN)**                                                                                   **Friedland, Steven**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 1/15/2019 | Purchase | 35 | $144.8600 |